IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(Topeka Docket)

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>MIDWEST GRAIN PRODUCTS, INC., and<br>HARCROS CHEMICALS, INC.<br><br>Defendants. | Case No. 19-40021-01/02-HLT |

## INDICTMENT

The Grand Jury charges:

**THE DEFENDANTS**:

1)  From its relatively modest beginnings, defendant Midwest Grain Products, Inc. (hereinafter **MGPI**), a publicly traded company since 2002, has evolved over the decades to become a multi-faceted provider of premium distilled spirits and value-added ingredient solutions derived from grain. Today, the company is the largest U.S.

1

producer of specialty wheat proteins and starches and one of the country's largest and most established producers of natural food grade alcohol. The MGPI Atchison Kansas facility is located near a primarily urban part of the city of Atchison, Kansas, about 50 miles northwest of Kansas City, Missouri. MGPI's facility includes a Mod B area, where specialty wheat starches are manufactured to customer specifications. At Mod B, different chemicals are utilized to satisfy various desired characteristics of the specialty and commodity starches, including the use of sulfuric acid to modify starch through pH adjustment, and the use of sodium hypochlorite to oxidize starch. The Mod B area comprises the Mod B building and an adjacent outdoor tank farm. The tank farm includes large tanks where incompatible chemicals, including Sulfuric Acid and Sodium Hypochlorite, are stored. The tanks are filled through fill lines. The connector ends of the fill lines are in close proximity to each other. The Mod B building contains an indoor process area where chemicals are combined to manufacture product. The building also

contains a locker room, laboratory, and a control room where operators perform most of their

duties, which include monitoring process conditions.

2) Defendant **Harcros** Chemicals (hereinafter **Harcros**), manufactures and distributes industrial and specialty chemicals and blends throughout the United State, primarily in the Midwest and Southeast United States. Headquartered in Kansas City, Kansas, **Harcros** operates 2 chemical manufacturing facilities and 29 distribution locations. **Harcros** distributes about 50 hazardous materials including sulfuric acid, sodium hydroxide, sodium hypochlorite and propylene oxide to **MGPI,** which **MGPI** uses in the processing of product.

**DEFINITIONS** (for purposes of this indictment):

3) "Driver" is a cargo tank motor vehicle (hereinafter **CTMV**) driver and an employee of Defendant **Harcros** who drives and delivers chemicals to manufacturing industries including defendant **MGPI**.

4) "Operator" is an employee of defendant **MGPI**.

5) A **standard operating procedure** (hereinafter "**SOP**") is a set of step-by-step instructions compiled by an organization to help workers carry out complex routine operations. **SOPs** aim to achieve efficiency, quality output and uniformity of performance, while reducing miscommunication and failure to comply with industry regulations.

6) **MGPI** had an **SOP** (hereinafter "**MGPI SOP**") containing instructions regarding offloading of hazardous chemicals at the **MGPI** facility, including steps designed to prevent mixing of incompatible hazardous chemicals, including sulfuric acid and sodium hypochlorite, during offloading activities.  The **MGPI SOP** required that the MGPI operator remain present during the connection and personally open the valve to the correct fill line.

7) **Harcros** also had an **SOP** (hereafter "**Harcros SOP**") that provided step-by-step instructions to **Harcros** drivers, including steps designed to prevent mixing incompatible hazardous chemicals during offloading activities and steps to take in the event of a release of a hazardous chemical during offloading activities.  The **Harcros SOP**

required the driver confirm that the material will be loaded into the correct tank and that the driver continuously monitor the transfer until the correct amount of material have been transferred.

**THE INCIDENT:**

8) At approximately 7:35 AM on October 21, 2016, a driver for defendant **Harcros** arrived at the **MGPI** Atchison facility to complete a scheduled delivery of 30% sulfuric acid. Upon arrival, the driver exited the cab and began to pressurize the cargo tank for unloading. At approximately 7:42 AM, the driver took the bills of lading to the Mod B building where the **MGPI** night shift operator on duty reviewed and signed the paperwork for accepting a delivery. Because the driver arrived at **MGPI** at 7:35 AM, prior to the start of the day shift, the night shift operator accepted the delivery.

9) At 7:44 AM, the operator escorted the driver from the Mod B building to the chemical unloading area. When they reached the rear of the CTMV, the driver set his paperwork on the back of the cargo tank and walked down the passenger side to finish donning his personal

protective equipment. During this time, the operator unlocked the gate in front of the transfer equipment and removed the lock on the cam lever dust cap for the sulfuric acid fill line. The operator placed the lock from the sulfuric acid fill line on the angle iron above the fill line.

10) The driver removed the seal from the back of the cargo tank, handed it to the operator, and then retrieved the hose from the CTMV to begin the connection. Contrary to the **MGPI SOP**, the operator then returned to the Mod B building at approximately 7:47 AM before the driver connected the discharge hose to the fill line. The driver removed the dust cap from the first unlocked fill line that he saw at the facility, which he assumed to be the sulfuric acid fill line but which was in fact a sodium hypochlorite fill line. Contrary to the **Harcros SOP**, the driver connected the hose to the sodium hypochlorite fill line without verifying that it was the correct fill line and then connected the other end of the hose to the cargo tank of sulfuric acid.

11) Contrary to the **MGPI SOP**, the **MGPI** operator did not remain in the area while the driver made the connection. The Sodium

Hypochlorite fill line, located a mere **18** inches from the Sulfuric Acid fill line, was unlocked. The driver connected the cargo tank of Sulfuric Acid to the Sodium Hypochlorite line. Before 8 a.m. that day, a greenish yellow toxic chlorine gas cloud began to form in the area.

12) 4000 gallons of Sulfuric Acid were combined with 5800 gallons of Sodium Hypochlorite over a 45-minute period, causing a plume of toxic chlorine gas and other chemicals, to cover Atchison for 45 minutes until emergency personnel arrived to turn off the flow. The Atchison County Department of Emergency Management ordered thousands of community members to shelter-in-place and other community members to evacuate in some areas. Over 140 individuals, including members of the public, first responders, **MGPI** employees and a **Harcros** employee sought medical attention. One **MGPI** employee and five members of the public required hospitalization because of the exposure to the cloud of toxic chlorine gas.

**KNOWING AND/OR NEGLIGENT ACTS OF MGPI**:

13) Defendant **MGPI** management failed to ensure that employees were aware of and adhered to work practices the **MGPI SOP**. Operators were supposed to open the fill lines verify the connection and stay in the area until these procedures were accomplished. **The MGPI SOP** also required that Operators close the fuel lines after delivery was accomplished.

14) **MGPI** had identified the mixing of incompatible chemicals as a risk at the Mod B plant but did not take steps to minimize this risk. **MGPI** was aware of, but failed to employ, state of the art equipment at the Mod B plant that would have allowed automatic opening and closing of the fill lines and would have detected creation of chlorine gas. **MGPI** was aware that the fuel lines for incompatible chemicals at the Mod B plant were too close together, and were not marked at the point of the connection. However, at other parts of the facility that contained chemical storage tanks, upgrades were made that included using color coding and different locking mechanisms. Prior to the October 21, 2016

incident, **MGPI** personnel were also aware that the sodium hypochlorite line was left unlocked, which allowed the driver to mismatch the fill lines.  As a result, **MGPI** did not design and maintain a safe facility consistent with current industry standards, generally accepted good engineering practices and recommendations cited in the chemical material safety data sheets that would have prevented or minimized the consequences of accidental releases of extremely hazardous substances at the Mod B plant.

**KNOWING AND/OR NEGLIGENT ACTS OF HARCROS**:

15)   The **Harcros** Driver's practices did not align with the Harcros SOP in  several ways. The driver did not confirm that the hose from the truck was connected to the correct valve and piping to the correct storage vessel; and, the driver returned to the cab of the truck which faced away from the unloading area instead of constantly monitoring the connection.  In addition, the driver's training was not adequate because he did not think to activate the shut-off at the front of the trailer.  And lastly, the truck/driver was not equipped with

respiratory protection, such as a full-face respirator, as recommended in the material safety data sheet for Sulfuric Acid 30%.

## COUNT 1

16) Paragraphs 1 through 15 are incorporated herein as though fully set forth.

17) On or about October 21, 2016, in the District of Kansas, the defendant,

**MIDWEST GRAIN PRODUCTS, INC**.

as an owner or operator of a stationary source producing, processing, handling, and storing extremely hazardous substances, knowingly violated its general duty under statute to prevent the accidental release and to minimize the consequences of any such release of any extremely hazardous substance, including chlorine, and identify hazards which would result from such releases using appropriate hazard assessment techniques, to design and maintain a safe facility taking such steps as are necessary to prevent releases, and to minimize the consequences of

accidental releases which do occur.  The foregoing is in violation of Title 42, United States Code, Section 7412(r)(1) and 7413(c)(1).

## COUNT 2

18) Paragraphs 1 through 17 are incorporated herein as though fully set forth.

19) On October 21, 2016, in the District of Kansas, the defendant,

**MIDWEST GRAIN PRODUCTS, INC., and/or HARCROS CHEMICALS, INC.**

knowingly released and caused to be released into the ambient air, a hazardous air pollutant to wit, chlorine gas, and knowingly placed other persons in imminent danger of death or serious bodily injury; in violation of Title 42, United States Code, Section 7413(c)(5).

## *ALTERNATIVELY*

## COUNT 3

20) Paragraphs 1 through 19 are incorporated herein as though fully set forth.

21)   On October 21, 2016, in the District of Kansas, the defendant,

**MIDWEST GRAIN PRODUCTS, INC., and/or HARCROS CHEMICALS, INC.**

Negligently released and caused to be released into the ambient air, a hazardous air pollutant to wit, chlorine gas, and negligently placed other persons in imminent danger of death or serious bodily injury; in violation of Title 42, United States Code, Section 7413(c)(4).

A TRUE BILL.

| | |
|---|---|
| March 6, 2019 | s/ Foreperson |
| Date | FOREPERSON OF THE GRAND JURY |

s/Richard L. Hathaway, #07767
Assistant United States Attorney
for Stephen R. McAllister
United States Attorney
District of Kansas
444 S.E. Quincy, Suite 290
Topeka, Kansas 66683
Telephone:  (785) 295-2850

[It is requested that trial be held in Topeka, Kansas.]